UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
UNITED STATES OF AMERICA,

   -against-                             **MEMORANDUM & ORDER**
                                                 15-CR-378 (FB)

KADEEM BACOTE,

           Defendant.
---------------------------------------------------x

*Appearances:*
*For the United States:*                      *For the Defendant:*
ROBERT L. CAPERS                       MIA EISNER-GRYNBERG
United States Attorney                  MICHELLE A. GELERNT
Eastern District of New York         Federal Defenders of New York, Inc.
271 Cadman Plaza East               One Pierrepont Plaza, 16th Floor
Brooklyn, New York 11201           Brooklyn, New York 11201

By:    ARTIE MCCONNELL
        Assistant United States Attorney

**BLOCK, Senior District Judge:**

On April 28, 2016, Kadeem Bacote was convicted by a jury of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He now moves for a new trial pursuant to Federal Rule of Criminal Procedure 33 because of certain statements I included in my instructions to the jury. The motion is denied.

**I**

The factual circumstances leading to my decision to provide the challenged instructions are helpful to understanding why my discretion to comment on the

evidence was exercised appropriately in this case.

On June 23, 2015, the night of Bacote's arrest, a confidential informant ("CI") provided a tip to a police officer that a group of individuals was walking towards 388 Clifton Place and identified "a tall, shirtless, African-American male with a firearm secreted inside of a plastic 'Cookies' shopping bag." Gov't Mot. in Lim., ECF No. 23, at 2. Relying on this tip, the police arrived at 388 Clifton Place and observed the group, including a tall, shirtless, African-American male carrying a plastic bag. At one point, that individual entered the lobby of 388 Clifton Place and exited moments later without the bag. A police officer entered the lobby minutes later and located behind a radiator cover a plastic bag, which contained a firearm wrapped in a t-shirt. The shirtless, African-American male was arrested, and identified as Kadeem Bacote.

Prior to Bacote's trial, it became clear that the government did not intend to call the CI as a witness. It nonetheless moved in limine to have the CI's statement admitted in evidence. Bacote objected, arguing that the statement was inadmissible hearsay and its admission would be a violation of the Sixth Amendment's Confrontation Clause. I agreed with Bacote that the substance of the CI's statement should not be admitted for its truth as inadmissible hearsay, and ruled under FRE 403 that admitting it for any other purpose would be unfairly prejudicial to him.[1] While the substance of the tip was

---

[1] Having ruled the substance of the tip inadmissible, I did not address the Sixth Amendment issues it might have posed.

not to be admitted, I held that the police officers at trial would be permitted to testify that they received a confidential tip—without mentioning the substance of the CI's statement—to explain why they went to 388 Clifton Place the night of the arrest. *See* Mem. and Order, ECF No. 39, at 3-5.

With that evidentiary ruling in place, Bacote's first trial commenced. However, despite the government's efforts to lead its witnesses away from the substance of the CI's tip, the officers' testimony undoubtedly crossed the line and the jury was made privy to the tip's full substance.[2] Bacote promptly made a motion for a mistrial, which I granted. At the government's behest, the case was set down for a second trial.

To better ensure Bacote received a fair retrial, I modified my prior evidentiary ruling to preclude the government from eliciting any testimony that related to the CI. In this regard, the officers were permitted to testify only that they received a call, and based on that call, went to 388 Clifton Place. I instructed defense counsel, however, that she ran the risk of "opening the door" to the CI's tip being admitted if her cross-examination challenged the officers in a way that—in order to give a cogent answer—

---

[2] On direct examination, Sergeant Paul Scocca testified that he received a call from a CI that there was an individual with a firearm near 388 Clifton Place. First Trial Tr. at 74-75. Subsequently, Detective Michael Topping testified that another officer surveilling 388 Clifton Place stated: "There is the gentleman matching the tip." *Id.* at 94.

would require them to testify about the CI.[3] *See generally* Tr. of Proceedings, March 24, 2016, ECF No. 46.

At Bacote's second trial, the government called eight witnesses. The critical testimony was elicited from Detective Jallar Holley—who testified to observing Bacote, shirtless, carry a rolled-up, white plastic bag into the lobby of 388 Clifton Place and exit moments thereafter without the bag—and Detective Michael Topping—who testified to entering the lobby of 388 Clifton Place minutes after Bacote exited, opening a radiator cover and finding a white plastic bag, which contained a pistol wrapped in a t-shirt. The defense elicited testimony from one witness, an investigator at the Federal Defender's office.

Throughout the trial, the witnesses avoided testifying about the CI and the CI's tip, and defense counsel avoided opening the door to such testimony.

However, when discussing Detective Holley's testimony during her summation, defense counsel suggested to the jury that Detective Holley may have identified Bacote

---

[3] While the Second Circuit has not commented on the issue, there is currently a circuit split regarding whether the defense's conduct can create an opportunity for the introduction of evidence that would otherwise violate the Confrontation Clause. *Compare United States v. Lopez-Medina*, 596 F.3d 716, 733 (10th Cir. 2010) ("[A] defendant can open the door to the admission of evidence otherwise barred by the Confrontation Clause."), *with United States v. Cromer*, 389 F.3d 662, 679 (6th Cir. 2004) ("[T]he Confrontation Clause confers a powerful and fundamental right[,] . . . [and] the mere fact that Cromer may have opened the door to the testimonial, out-of-court statement that violated his confrontation right is not sufficient to erase that violation.").

as the shirtless individual with the bag because he was "working backwards," or because he had a "hunch." Trial Tr. at 442-43. Defense counsel went on to raise questions as to why Detective Topping, who had testified that he had not seen the plastic bag before finding it in the radiator, was the one who searched for the plastic bag when Detective Holley was the only officer to have seen it.[4]

After defense counsel's summation, the government moved to reopen its case to recall witnesses to testify to the substance of the CI's tip. During a recess, I reviewed the transcript of the defense summation and admitted being troubled by defense counsel's arguments. *See* Trial Tr. at 471. I did not allow the government to reopen its case, and as per my instructions, it did not refer to the CI in its rebuttal. But I did address the problems raised by defense counsel's summation through curative instructions emphasizing that the jury should not speculate as to matters not in evidence and that the focus of the jury's decision was the credibility of the police testimony.

With respect to speculating on the evidence, I instructed the jury:

> The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a deduction or conclusion which you, the jury, are permitted to draw but not required to draw from the facts which have been established by either direct or

---

[4] Specifically, defense counsel said: "Topping, who has not seen the bag, goes rooting around with his flashlight looking into grates for an unidentified bag that he's never seen before when the guy who saw the bag is just standing around. . . . So instead of [Holley] looking for the bag that he claims he saw, he sends someone who never saw a bag rooting around with a flashlight." Trial Tr. 443-44.

5

circumstantial evidence.

In drawing inferences, you should exercise your common sense. So while you are considering the evidence, you're permitted to draw from the facts which you find to be proven such reasonable inferences as would be justified in light of your experience.

So let me remind you that, once again, whether based upon direct or circumstanc[ial] evidence or [upon] logical reasonable inferences drawn from such evidence, you must be satisfied of the guilt of the defendant beyond a reasonable doubt before you may convict.

. . .

So in this case, you know, there may be a couple situations which may sort of, you know, make you wonder about things.

. . .

[O]ne possibility where I was concerned about possibly the risk of speculation is when defense counsel made some mention about maybe Holley was working backwards. You have nothing before you to know whether he's working in front of you, behind you, backwards. So don't speculate. It's so important to just say, what are the facts in this case, and not speculate. All right? Draw reasonable inferences, but not speculation.

Later on, it was said that maybe he had a hunch. So if you start speculating, well, did he have a hunch? What was that hunch? Could it have been this? Could it have been that? That's speculation. You don't know. So you don't want to go there. Just be very mindful of that when you go through the facts of this case. Am I speculating or is it based upon real evidence in the case?

Trial Tr. at 503-06. Next, I instructed the jury on assessing the credibility of witnesses:

Now, we get to the point of witness credibility. You had the opportunity to observe all the witnesses. It is part of your job to decide how believable the witnesses were in their testimony.

. . .

Now, once again, you're the sole judges of the credibility of the witnesses and of the importance of their testimony. You remember, once again, the burden of proof is always on the government and the

defendant's not required to call any witnesses or offer any evidence, since he's presumed to be innocent.

. . .

I said one of the things you want to really make sure was that you're sizing up their credibility, because a lot of times credibility can be ascertained from [not only] verbal things, but sometimes no[n-]verbal things, as well, right? It's a very important part, especially this case, where it really is all about the credibility.

I think that I made some notes when the government made its opening comments. I think that they got it right. I think I agree with that. Mr. McConnell said that the only question for you as the jury and the finders of fact in this case is whether or not on June 23rd, 2015, the defendant possessed that firearm. Now, the fact that I'm quoting from what he said is not any indication that you should find for the government or not find for the government, but I just want to focus your attention on, you know, what the real issues are in the case.

And that then he said if you believe the officers, if you believe what they saw, what they told you that, he's guilty. That's correct. If you don't, then you must acquit. And it's really that simple of a choice. So the case really focuses here essentially on credibility.

If you believe the officers – and I think we're talking about primarily Holley and Topping, then you believe them based upon all the evidence in the case, you consider everything in terms of whether you believe them or not, right? But if you do then, you know, you have to convict him. If you don't believe them, then you acquit. So, you know, that's the focus. It's really a case that focuses essentially on the credibility of the witnesses who have testified here before you.

Okay. Don't be distracted by anything else. Consider all the evidence for sure in assessing whether you believe the officers or not. That's perfectly permissible, right? You size them up. But if you do believe them, then you have to convict them. If you don't believe them, then you have to acquit.

Okay. So it must be clear to you by now that you are being called upon to resolve factual issues under the indictment in the face of very [different] pictures painted by the government and the defense which cannot be reconciled. That's why we need jurors. So we know you have to make these credibility determinations.

> And so let me give you some ABCs you can ask yourselves in terms of sizing up the credibility of the police officers.

Trial Tr. at 506-08.

The jury deliberated for several hours before returning a guilty verdict.

## II

On a Rule 33 motion for a new trial, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33. Bacote argues that he was denied a fair trial because my instructions to the jury substituted an "improper and misleading burden of proof" and "unfairly marshal[ed] the evidence." Bacote Mot., ECF No. 54, at 2.

When considering the propriety of a jury charge, a challenged instruction is not reviewed in isolation. Instead, courts must "consider it in context 'to determine whether considered as a whole, the instructions adequately communicated the essential ideas to the jury.'" *United States v. George*, 779 F.3d 113, 118 (2d Cir. 2015) (quoting, *United States v. Sabhnani*, 599 F.3d 215, 237 (2d Cir. 2010)); *see also Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.").

A court's review of a challenged jury instruction also entails an inquiry into whether the error was harmless. "[A]n error is harmless if 'the jury's actual finding of guilty . . . would surely not have been different absent the constitutional error.'" *United States v. Ekinci*, 101 F.3d 838, 843 (2d Cir. 1996) (quoting *Sullivan v. Louisiana*, 508

U.S. 275, 280 (1993)). "In deciding whether the finding of guilt would have been the same absent the error, [courts] examine the erroneous instruction in the context of the instructions as a whole as well as the evidence." *Id.*

### A

My instructions to the jury did not substitute the incorrect burden of proof or improperly marshal the evidence.

According to the Supreme Court:

> In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important, and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination.

*Quercia v. United States*, 289 U.S. 466, 469 (1933). Of course, the discretion of a trial judge to so comment has "inherent limitations." *Id.* at 470. While the judge may "analyze and dissect the evidence, . . . he may not either distort it or add to it." *Id.* Any comment by the trial judge "should be so given as not to mislead, and especially that it should not be one-sided" and "deductions and theories not warranted by the evidence should be studiously avoided." *Id.*

While the Supreme Court has not overruled *Quercia*, the Second Circuit has noted, in dicta, that the practice of trial judges to summarize and comment upon the

9

evidence "has fallen into widespread disfavor" because in doing so, "courts inescapably influence the jury on decisions which should be in the jury's sole province." *United States v. Mundy*, 539 F.3d 154, 158 (2d Cir. 2008). But the Second Circuit still recognized that there are certain "special circumstances" in which "the practice serves justice valuably." *Id.* at 158 & n.3. While the *Mundy* court noted that commenting on the evidence would be particularly valuable "where it assists the jury to compartmentalize evidence in complex cases, including how the evidence relates differently to different parties," it did not enumerate an exhaustive list of what those special circumstances might be. *Id.* at 158 n.3.

The difficult situation presented in this case provided me ample justification to provide the challenged jury instructions. Defense counsel's suggestions during her summation that Detective Holley was "working backwards" or off a "hunch" and that it was curious that Detective Topping searched for the plastic bag despite not having personally seen it would have had no persuasive force had I allowed the government's witnesses to testify about the CI's tip. Had the jurors been privy to the substance of the CI's tip, they would have known that Detective Holley focused on Bacote—the tall, shirtless, African-American man carrying a plastic bag— because that is who the tip identified, and Detective Topping knew to look for the bag because of the CI's tip. There was thus merit to the government's motion to reopen its case and recall witnesses to rebut defense counsel's arguments with testimony about the CI.

But allowing the government to reopen its case would have opened the door to a wide range of testimony well beyond the CI's tip. There would have been a collateral trial dealing with a number of issues relating to the CI's reliability, including payments made to the CI in exchange for the tip, the CI's criminal record, the CI's prior history as an informant, etc. *See, e.g.*, Bacote's Response in Opposition, ECF No. 33 at 2 (discussing disclosure of information about the CI). And defense counsel would have been entitled to more discovery—and the opportunity to reopen the defendant's case to call witnesses and adduce other evidence—all of which might have necessitated a significant continuance of a trial which had otherwise been completed. There also remained a substantial risk that, even with a curative instruction, the jury would consider the CI's tip—which I had already determined was inadmissible hearsay—for its truth, which itself could have denied Bacote a fair trial, and reopening the case would have taken the jury's attention away from the critical testimony in the case: what the police officers actually observed at 388 Clifton Place on the night of June 23, 2015. Moreover, Bacote could have additionally been prejudiced because the additional testimony would have contradicted his counsel's representation to the jury that the police officers' tactics were questionable.

In sum, reopening the trial could have unleashed a host of variables resulting in substantial jury confusion, a disproportionate lengthening of what had been a short trial, and undue prejudice to Bacote. Thus, under the facts and circumstances of this case,

reopening would have run a heightened risk of an abuse of discretion. *See United States v. Crawford*, 533 F.3d 133, 137-38 (2d Cir. 2008) (holding a district court abused its discretion when reopening a case after the conclusion of summations). And the alternative—simply denying the government's motion to reopen its case without providing any curative instructions—would have been unfair to the government because the defense's summation crossed the line into using the Confrontation Clause as both a sword and shield. *See Ko v. Burge*, 2008 WL 552629, at *13 (S.D.N.Y. Feb. 26, 2008) ("If [the door could not be opened], a defendant would be free to mislead a jury by introducing only parts of an out-of-court statement, confident that the remainder of the statement could not be introduced because the Confrontation Clause would provide a shield."). In my attempt to navigate between Scylla and Charybdis, I concluded that the most reasonable way to address these competing dynamics was to give the instructions Bacote now challenges.

In addition to being supported by special circumstances, the challenged jury instructions fell well within the discretion afforded a trial judge by the Supreme Court in *Quercia*. When instructing the jury not to speculate and to focus on the credibility of the police officers, I did not add to or distort the evidence. In fact, my instruction that the jury should avoid speculating as to whether Officer Holley had a "hunch," or was "working backwards," was intended to counteract defense counsel's "deductions and theories not warranted by the evidence." *Quercia*, 289 U.S. at 470.

Nor did my instructions demonstrate a particular bias in favor of the government. While I did note that I agreed with the government that the focus of the case was the credibility of the police testimony and cautioned the jury not to speculate in the manner invited by defense counsel, I also repeatedly reminded the jurors that they were not to infer any partiality from my comments and that they were the exclusive finders of fact. *See, e.g.*, Trial Tr. at 494 ("[Y]ou, of course, are the only folks that are going to decide what the facts are. I have nothing to do with that."); *id.* at 495 ("Now, as far as your role, once again, you are the sole and exclusive judges of the facts."); *id.* at 496 ("In determining the facts, you must rely upon your own recollection of the evidence."); *id.* ("Nor is anything I may have said to you during the trial or may be saying to you during these instructions with respect to a fact or any other matter in this case of a factual nature may be taken in substitution for your own independent recollection. Because what I say is not evidence, either."); *id.* at 497 ("I do not, once again, mean to indicate any opinion as to the facts or what your verdict should be. That's your call. The rulings I have made during the trial, and what I'm explaining to you during the course of my comments here are not any indication of my views of what your decision should be as to whether or not the guilt of the defendant has been proven beyond a reasonable doubt. You are expressly to understand that the Court has no opinion as to the verdict you should render in this case."); *id.* at 503 ("It is for you and you alone to decide what inferences you will draw."); *id.* at 512 ("Whatever I say in this charge here,

when I call attention to what was said by the government or defense counsel, it is not any indication of what your decision should be. Be clear about that.").

Furthermore, focusing the jury's attention on assessing the police officers' credibility did not substitute an improper burden of proof. To convict Bacote of 18 U.S.C. § 922(g)(1), the jury must have found that the government proved beyond a reasonable doubt that Bacote: (1) prior to June 23, 2015—the date of the offense—had been convicted of a crime punishable by imprisonment for a term exceeding one year and (2) knowingly and intentionally possessed a firearm that (3) had been shipped or transported in interstate commerce. In my instructions, I outlined these three elements in detail and explained: "in order for you to find the defendant guilty of this crime, the government must prove each of the following elements beyond a reasonable doubt." Trial Tr. at 518. I went on to repeat to the jury—numerous times—that the government always had the burden to prove the elements of the crime beyond a reasonable doubt. *See, e.g.*, *id.* at 499 ("[T]he burden, of course, is always upon the goverment to prove guilt beyond a reasonable doubt. You have been told that over and over. This burden never shifts to the defendant . . . ."); *id.* at 500 ("[U]nless the government proves beyond a reasonable doubt that the defendant has committed each and every element of the offense charged . . . you must find the defendant not guilty of the charge here."); *id.* at 506 ("[R]emember, once again, the burden of proof is always on the government and the defendant's not required to call

14

any witnesses or offer any evidence, since he's presumed to be innocent."); *id.* at 515 ("[I]t is the government's burden to prove the defendant's guilt. That burden remains with the government throughout the entire trial and never shifts to the defendant.").

Evaluating the jury instructions as a whole, "they adequately communicated the essential ideas to the jury." *George*, 779 F.3d at 117.

**B**

Even assuming, for the sake of argument, that my instructions to the jury were improper, any error was harmless.

First, the statements that Bacote challenges make up a tiny fraction of the lengthy instructions I gave to the jury. And, as is discussed above, any indication that the challenged instructions demonstrated a bias of the Court or that the burden of proof was anything less than beyond a reasonable doubt for every element of the offense was addressed repeatedly by my numerous statements to the contrary.

Second, even if I had not focused the attention of the jury on the importance of the testimony of Detectives Holley and Topping, the jury would have known to focus their considerations as such anyway because both the government and defense counsel drew special attention to them. *See, e.g.*, Trial Tr. 401, 429-35. And for good reason. The defense did not seriously challenge that Bacote had been convicted of a crime punishable by more than one year and that the gun found in the plastic bag in the radiator had been transported in interstate commerce. The crucial question for the jury

15

to decide was whether Bacote knowingly and intentionally possessed the firearm, and only the testimony of Detectives Holley and Topping could establish that. Holley testified that he saw Bacote enter 388 Clifton Place carrying a rolled-up, white plastic bag and exit almost immediately without the bag, and Topping testified that he found a rolled-up, white plastic bag in the lobby of 388 Clifton Place, behind a radiator cover, only minutes after Bacote exited. If the jury found this testimony credible, that is enough to find beyond a reasonable doubt that Bacote knowingly and intentionally possessed the firearm.

Bacote argues that my instruction to the jury prevented the jurors from possibly "believ[ing] the officers' testimony, and yet also believ[ing] that the government did not prove beyond a reasonable doubt that Mr. Bacote knowingly possessed the contents of the bag." Bacote Mot., ECF No. 54, at 3. It is certainly within the realm of possibilities that the jury could have credited the police testimony and found that Bacote possessed the bag and hid it in a radiator but at no time knew that the bag contained a firearm. But to undo a jury verdict to allow for this possibility would raise the government's burden of proof to beyond all doubts, whether reasonable or not.

## IV

Bacote's motion for a new trial is DENIED.

**SO ORDERED.**

/S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
August 12, 2016